**James E. FUNKE et al., Plaintiffs,**

v.

**LIFE FINANCIAL CORPORATION et al., Defendants.**

**No. 99 Civ.11877 CBM MHD.**

United States District Court,
S.D. New York.

Dec. 10, 2002.

## OPINION AND ORDER

MOTLEY, District Judge.

This court has received the Report and Recommendation on the instant case dated October 2, 2002, from the Honorable Michael H. Dolinger, United States Magistrate Judge. The court has also received the objections to Judge Dolinger's report filed by defendants. Having conducted a *de novo* review of the record, the court hereby adopts the Report and Recommendation as the opinion of the court pursuant to 28 U.S.C. § 636(b)(1).

Accordingly, the court GRANTS defendants' motions to dismiss with respect to plaintiffs' claims brought under the Securities Exchange Act of 1934 and DENIES defendants' motions to dismiss with respect to plaintiffs' claims brought under the Securities Act of 1933. The Securities Exchange Act claims are dismissed without prejudice to the service and filing of an amended complaint within thirty days of this Opinion and Order.

The court will hear argument on the Motion to Transfer Venue and the Motion to be Appointed Lead Plaintiff at the pre-trial conference scheduled for Wednesday, December 18, 2002. The conference will begin at 10:30 a.m. in Courtroom 26–A of the United States Courthouse located at 500 Pearl Street, New York, New York.

## REPORT & RECOMMENDATION

DOLINGER, United States Magistrate Judge.

Plaintiffs are purchasers of shares of common stock in defendant Life Financial Corporation ("LFC"). Having bought small quantities of shares on the open market in 1998 and 1999, they commenced this class-action lawsuit in December 1999, claiming that they and others had been defrauded or misled as to the financial health of the company when making stock purchases between June 24, 1997 and March 3, 1999. Plaintiffs seek damages on behalf of themselves and a class of buyers of that common stock, and in pursuit of that goal they have sued LFC; seven of its officers and directors; the investment banking firm of Keefe, Bruyette & Woods, Inc., which was the lead underwriter of an initial public offering of LFC stock in June 1997, and DeLoitte & Touche LLP, the accounting firm that audited the financials of LFC in connection with the initial public offering and subsequent public filings. As the legal underpinning for their demand for relief, they assert claims under sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k & 77o, and sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a).

LFC and its defendant officers and directors have moved to dismiss the complaint in its entirety for failure to plead a cognizable claim and failure to plead fraud with particularity. Defendant Deloitte Touche has joined in that motion. As for Keefe, it has separately moved to dismiss the one claim asserted against it, arguing that plaintiffs lack standing and fail to plead a cognizable section 11 claim. Plaintiffs have opposed both motions.

We conclude that plaintiffs fail to plead scienter, as required for their Securities Exchange Act claims, but that they adequately allege claims under the Securities

Act. Accordingly, we recommend that the LFC motions be granted with respect to the Securities Exchange Act claims, but denied with respect to the Securities Act claims. We also conclude that the dismissal motion by Keefe Bruyette should be denied.

### A. *Plaintiffs' Allegations and Claims*

LFC arranged an initial public offering ("IPO") of 2,900,000 shares of its common stock, effective June 24, 1997, at a per-share price of $11.00 dollars. (Compl. at ¶¶ 2, 35). By comparison, as of June 30, 1999, more than 15,300,000 shares of common stock of LFC were outstanding. (*Id.* at ¶ 21).

According to the complaint, the registration statement and prospectus for the IPO both contained false and misleading statements about the financial performance of LFC for fiscal year 1996 and the first quarter of 1997. (*Id.* at ¶ 3). Plaintiffs allege that these documents substantially overstated net income, interest income, earnings per share and investor equity. (*Id.* at ¶ 2). Plaintiffs further allege that LFC continued to make comparable misrepresentations in a series of public statements and filings that covered the period from the second quarter of 1997 through 1998. (*Id.*). The complaint states that these false or fraudulent representations were not corrected until March 3, 1999, when LFC restated its financial results for the entire class period, thus revealing for the first time that the performance of the company during that period had been far less profitable than previously suggested. (*Id.*).

The complaint goes on to specify the financial figures that LFC reported and later changed, and defendants do not contest these allegations for purposes of the current motion. We summarize them, as they are pled by plaintiffs.

In the prospectus, the company included audited financial statements for 1994, through 1996 and also reported unaudited results for the first quarter of 1997. (*Id.* at ¶ 36). Plaintiffs do not mention the figures reported for 1994 and 1995. The financial statement for 1996 reported earnings of $1,505,000, or $0.63 per share, and a shareholder equity of $9,273,000. (*Id.* at ¶¶ 36–37, 53).[1] As for the first quarter of 1997, the company listed earnings of $2,242,000, or $0.70 per share. (*Id.* at ¶ 36). By contrast, when these figures were restated in March 1999, LFC reported, for 1996, a loss of $52,000, or $0.02 per share, and a shareholder equity of only $7,716,000. (*Id.* at ¶¶ 37, 52, 53). As for the first quarter of 1997, it reported a loss of $190,000. (*Id.* at ¶ 37).

Plaintiffs report similar disparities for 1997.[2] Thus, they allege that, for 1997, LFC's 10–K reported net income of $12.7 million, or $2.49 per share, interest income of $21.1 million and shareholder equity of $54,819,000. (*Id.* at ¶ 43). By comparison, in the corrected report these numbers were changed to $10,324,000 in net income, or $2.02 per share, and $50,889,000 in shareholder equity. (*Id.* at ¶¶ 43, 53).

For 1998, the figures initially reported and then restated in 1999 also changed, but not in any clear pattern suggesting a greater degree of corporate financial frail-

---

1. Paragraph 37 cited shareholder equity figures of "$9,273 million" and "$7,716 million". We infer that these represent a drafting or typographical error. (*See* Compl. at ¶ 53).

2. In their complaint plaintiffs specify the figures announced quarterly by LFC for 1997

but they do not compare those with equivalent corrected numbers except for the first quarter of 1997. Rather they compare annual figures for 1996 and 1997. They do separate the quarterly figures for 1998. (*See id.* at ¶¶ 36–53).

ty. According to plaintiffs, the 1998 first-quarter net income initially reported was $3,717,000, whereas the corrected figure changed minutely, to $3,715,000. (*Id.* at ¶¶ 44–45, 53). This alteration did not change per-share income from the originally reported $0.54. (*Id.* at ¶¶ 44, 53). Reported shareholder equity did decline for that quarter from $58,536,000 to $54,605,000. (*Id.* at ¶¶ 45, 53).

As for the second quarter of 1998, the restated net income actually increased, from $1,152,000 to $1,521,000, with a per-share increase from $0.17 to $0.22. (*Id.* at ¶¶ 46–47, 53). For the same period, shareholder equity decreased from $59,718,000 to $56,154,000. (*Id.* at ¶¶ 47, 53).

For the third quarter, the changed figures were also not consistently unfavorable. Net income actually rose substantially, from the originally reported $1,805,000 to $2,535,000, or an increase in per-share net income from $0.27 to $0.37. (*Id.* at ¶¶ 48–49, 53). Again, however, reported shareholder equity decreased modestly as a result of the re-calculation, from $61,544,000 to $58,710,000. (*Id.* at ¶¶ 49, 53).

Plaintiffs do not specify the corrected results for the last quarter of 1998. They also do not mention the corrected annual figures for 1998.

As for the significance of these changes, plaintiffs suggest that they had a major impact on the price of shares. Thus they note that the IPO offered shares priced at $11.00 and that on March 4, 1999—the day after the restatement of the financials— LFC common shares were selling at $3.875 per share. (*Id.* at ¶ 2). It also bears noting that two of the three named plaintiffs report that they purchased shares in 1998 at $20.375 per share,[3] and that the

third plaintiff purchased shares on February 18, 1999, at which time they were selling for only $4.625 per share. (*Id.*, attached certificates of plaintiffs).

Plaintiff's allegations of fraud and misrepresentation require at least a brief description of the nature of the business of LFC, and the accounting issue that assertedly gave rise to the changes in the company's financials. We take the details from plaintiffs' extended set of allegations.

LFC is a savings-and-loan holding company. It originates, buys, sells, securitizes and services residential mortgage loans. (*Id.* at ¶ 26). The focus of the plaintiffs' allegations of misleading financial representations by defendants is on the securitization and sale of packaged loans.

According to plaintiffs, LFC bundles the mortgages together in a pool, and transfers the pool to a trust, which in turn sells financial interests in the loans, in the form of securitized bonds. (*Id.* at ¶¶ 27–28). The company retains the residuals, which represent the difference between the interest rates on the mortgages and the interest rate on the bonds, less expenses. (*Id.* at ¶ 28).

The purchasers of the bonds ultimately receive monies representing the payment of principal on the mortgages plus interest at the so-called pass-through rate. (*Id.* at ¶ 29). The residual asset consists of the right to receive cash flows from the mortgage pool after the bondholders are paid the principal and interest to which they are entitled. (*Id.*).

For accounting purposes, the company recognizes a gain from the sale of the pool of loans for the quarter in which the loans are sold. The gain is the difference between the adjusted fair market value of

**3.** The month listed in the certificate for Mr. and Mrs. Rastenis is illegible in the complaint on file with the court.

the residuals and the allocated cost basis of the loans that were sold in that quarter. (*Id.* at ¶ 30).

When the company recognizes a gain, it records the residual interests as assets on its balance sheet. (*Id.* at ¶ 31). As cash distributions are received from the trust, the recorded value of the residual interests is amortized. The residual interests are then marked to market on a quarterly basis. (*Id.*).

To improve the credit rating of the bonds, LFC arranges for so-called credit enhancements. (*Id.* at ¶ 32). One form of enhancement is an insurance and indemnity policy to guarantee the bondholders timely payment of principal and interest. (*Id.*). Another form of credit enhancement, required by the governing pooling and servicing agreements, is over-collateralization—for example, in the form of a cash reserve—which adds further assurance of payment to bondholders. (*Id.* at ¶ 33).

If cash reserves on deposit exceed certain specified levels, the excess is distributed to the holder of the residual interest. (*Id.* at ¶ 34). At the termination of the trust, any additional amount on deposit is also transferred to the holder of the residual interest. (*Id.*). During the pendency of the bonds, the over-collateralization will be reduced if losses are incurred as a result of defaults by borrowers on required principal or interest payments. Moreover, if these losses are sufficiently substantial, they may reduce the value of the residual interest. (*Id.*).

Plaintiff's claim of misrepresentations concerns the valuation of the residual interests held by LFC. According to plaintiffs, until LFC retroactively restated its financial statements for 1996 through 1998, it had improperly included as earnings certain amounts that should not have been so credited.

Plaintiffs allege that, in creating a credit enhancement, "it is common for the transferor" to use a cash reserve account or a subordinated interest. The example on which they focus is the deposit of cash in a reserve account. (*Id.* at ¶ 54). As payments on the mortgages are received and shared with the bondholders, the transferor's share of those proceeds will, for a period of time, be retained by the securitization vehicle to provide recourse in the event that the remaining accounts receivable are not fully paid. (*Id.*). At some point the transferor will be entitled, in accordance with the terms of the governing instruments, to receive cash remaining in the reserve accounts. (*Id.*).

The heart of plaintiffs' claims of fraud and misrepresentation is their contention that when defendants issued the pertinent financials, they used an improper method of accounting for the credit enhancements supporting LFC's mortgage pools. Specifically, they allege that LFC used the so-called "cash in" method, whereas the pertinent accounting requirement—embodied in Financial Accounting Standards Board ("FASB") Statement No. 125—compelled the use of the "cash out" method. (*Id.* at ¶¶ 55–60).[4] According to plaintiffs, the restatement of financials in March 1999 involved a switch from the cash-in to the cash-out method, and this change resulted in the cited alteration of the LFC figures for earnings and shareholder equity during the class period. (*Id.* at ¶¶ 50–53, 60). They further allege that the March 1999 restatement was a result of a "correction of an error" rather than an "accounting change", and that such an error is understood, in the accounting industry, to be an

4. For a summary of the distinction between these two methodologies, *see* Pltffs' LFC Memo, Ex. B at second page.

"oversight or misuse of facts that existed at the time the financial statements were prepared." (*Id.* at ¶ 61) (internal quotes omitted). Based on these allegations, plaintiffs assert four claims.

First, they invoke section 11 of the Securities Act of 1933 to press a claim against LFC and its officers and directors, as well as Keefe and Deloitte. (*Id.* at ¶¶ 62–70). In support of that claim they contend that the registration statement and prospectus issued in connection with the 1997 IPO "were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not misleading, and failed to disclose adequately material facts concerning [LFC]'s fiscal 1996 and first quarter 1997 financial results." (*Id.* at ¶ 63). Plaintiffs go on to allege that the published financial results "were materially false and misleading because they overstated net income, income interest and shareholder equity" (*id.*), and that plaintiffs and other purchasers did not know about the alleged omissions and misleading statements when they bought shares of the company. (*Id.* at ¶ 64).

Second, plaintiffs assert a claim under section 15 of the Securities Act against defendants Daniel L. Perl, L. Bruce Mills and Ronald G. Skipper, who are, respectively, the Chief Executive Officer, the former Chief Financial Officer and the Chairman of the Board of LFC. (*Id.* at ¶¶ 71–72). This claim parallels the section 11 theory, but seeks to impose liability on these three individuals as "controlling persons" within the meaning of section 15. (*Id.* at ¶ 72).

Third, plaintiffs assert a claim under section 10(b) of the Securities Exchange Act against LFC and Messrs. Perl and Mills and against Jeffrey L. Blake, the Chief Financial Officer since March 31, 1998. (*Id.* at ¶¶ 73–78). In support of this claim, plaintiffs allege that the financial reports issued by LFC from 1997 until their restatement in March 1999 were "materially false and misleading" because LFC was valuing its credit-enhancement assets on the basis of the "cash-in" method, even though the FASB Statement No. 125 had effectively changed the pertinent Generally Accepted Accounting Practices ("GAAP") as of January 1, 1997. (*Id.* at ¶ 74). According to plaintiffs, defendants Perl, Miller and Blake "intentionally or recklessly" ignored this change, and their uncorrected statements overstated net and interest income to the company and overvalued the corporate equity. (*Id.* at ¶ 74). Plaintiffs go on to allege, in terms taken from the cited statutory provision, that "[d]efendants employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct in an effort to maintain artificially high market prices for [LFC] common stock." (*Id.* at ¶ 75). Plaintiffs further assert that, as a result of this conduct, the market price of common shares was higher throughout the class period than it would have been if the truth had been known, and that plaintiffs and others had purchased in ignorance and been injured as a result. (*Id.* at ¶¶ 76–77).

Fourth, plaintiffs assert a parallel "controlling person" claim under section 20(a) of the Securities Exchange Act. (*Id.* at ¶¶ 79–81). Naming defendants Perl, Mills, Skipper and Blake, they allege that, by reason of their positions as officers and directors of LFC, they "had the power and authority to cause or prevent the wrongful conduct of [*sic.*] herein and did exercise such power and authority." (*Id.* at ¶ 80). On that basis plaintiffs contend that these individual defendants should be held liable for the section 10(b) violations.

## B. *Defendants' Motions to Dismiss*

The court has received two motions to dismiss the complaint for failure to state a claim and failure to comply with the plead-

ing standards of Fed.R.Civ.P. 9(b). One motion is made on behalf of LFC and the individual defendants, and addresses all of the plaintiffs' claims. Defendant Deloitte & Touche later joined this motion with respect to the section 11 claim, which is the only claim in which the accounting firm is named as a defendant.

The second motion to dismiss was filed on behalf of defendant Keefe, Bruyette & Woods. Since Keefe was named only in the section 11 claim, its motion targets only that claim.

The LFC motion initially addresses the section 10(b) claim. Defendants assert that plaintiffs have not adequately alleged scienter, have failed to plead the individual defendants' involvement in a fraud with the particularity required by Rule 9(b), and have failed to allege loss causation. (LFC Motion at 2). As for the section 11 claim, the defendants say that plaintiffs have failed to plead and cannot establish that their purchases were from or traceable to the initial public offering, as required for liability under section 11. (*Id.*). They also argue that the pleading of this claim does not satisfy the requirements of Rule 9(b). (*Id.*). Finally, they seek dismissal of both "controlling person" claims because plaintiffs fail adequately to plead that the individual defendants have such a status. (*Id.* at 2–3).

As for Keefe's motion, it seeks dismissal of the section 11 claim on two grounds. First, it argues that plaintiffs lack standing to assert the claim because they did not purchase shares in traceable to the initial public offering. (D & T Memo at 5–8). Second, Keefe says that plaintiffs fail to allege, as they must, that it was aware of the allegedly false statements and omissions when they were made. (*Id.* at 8–12).

## ANALYSIS

We first assess the LFC defendants' motion and then turn to the motion by Keefe. We start by summarizing the criteria applicable to a Rule 12(b)(6) motion.

### I. *The LFC Motion*

#### A. *Rule 12(b)(6) Standards*

In assessing the defendants' motion to dismiss for failure to state a claim, we must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. *See, e.g., Woodford v. Community Action Agency of Greene County, Inc.*, 239 F.3d 517, 526 (2d Cir. 2001); *Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir.1996); *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 101 F.3d 900, 903 (2d Cir.1996). So read, the complaint may be dismissed "only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Woodford*, 239 F.3d at 526 (quoting, *inter alia*, *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *accord, King v. Simpson*, 189 F.3d 284, 286 (2d Cir.1999); *Still*, 101 F.3d at 891; *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 4–5 (2d Cir.1996).

When deciding such a motion, the court must limit its consideration "to facts stated in the complaint[,] documents attached to the complaint as exhibits or incorporated in the complaint by reference ... [and] matters of which judicial notice may be taken under Fed.R.Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991); *see also Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir.1996).[5] The

---

**5.** The judicial notice that may be taken extends both to the status of other public proceedings, *see, e.g., Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998),

*cert. denied*, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999), and to publicly filed documents at least if they are integral to the complaint. *See, e.g., In re Merrill Lynch Ltd.*

court may also review documents that are deemed "integral" to the plaintiff's claim. *See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir.1996); *Int'l Audiotext Network, Inc. v. AT & T*, 62 F.3d 69, 71–72 (2d Cir.1995).

### B. *The Section 10(b) Claim*

To state a claim for a violation of section 10(b) of the Securities Exchange Act, the plaintiff must allege "that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff's reliance on the defendant's action caused the plaintiff injury." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 83 (2d Cir.1999) (quoting *Chill v. General Electric Co.*, 101 F.3d 263, 267 (2d Cir. 1996)). Defendants focus on plaintiffs' effort to plead scienter, which defendants contend is fatally flawed.

 The required state of mind that must be pled and proven to sustain a section 10(b) claim is that the defendant acted with "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (quoting, *inter alia, Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir.2000)). As for the required pleading standard, we must look first to the governing statute, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which provides that

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).

The statutory requirement that the plaintiff plead specific facts that permit a "strong inference" of the requisite state of mind is not entirely self-explanatory. Nonetheless, the Second Circuit has read the statute as consistent with its prior decisions specifying what a plaintiff must allege to satisfy the scienter requirement. *See, e.g., Kalnit*, 264 F.3d at 138; *Novak v. Kasaks*, 216 F.3d 300, 309–10 (2d Cir. 2000). Thus, the governing rule here is that the plaintiff must plead specific facts showing "[t]hat defendants had both a motive and opportunity to commit fraud," or else "alleg[e] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)).[6]

 We do not read the complaint as intended to allege a "motive and opportunity" basis for scienter. The pleading does not specify a motive for the type of deliberate misrepresentation that plaintiffs complain about, and we see no allegation that provides a basis for inferring such a motive. Indeed, the only assertion by plaintiffs that might be read as intended to

*P'ships Litig.*, 154 F.3d 56, 58 (2d Cir.1998). *See also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–77 (11th Cir.1999).

**6.** Although the Second Circuit noted in *Novak* that Congress had not incorporated the "motive and opportunity" terminology in the PSLRA and cautioned that the courts should not "employ or rely on magic words such as 'motive and opportunity' ", it also invited reliance on its prior precedent as a guide to whether a complaint has pled "facts giving rise to the requisite 'strong inference.' " *Novak*, 216 F.3d at 311. In fact, the circuit court itself has continued to use the pre-existing categories as the touchstone for determining the adequacy of pleading of scienter. *See, e.g., Kalnit*, 264 F.3d at 138–42; *Rothman v. Gregor*, 220 F.3d 81, 89–90 (2d Cir.2000).

satisfy this requirement is their claim that the use of the "cash-in" method inflated the company's announced income and shareholder equity, and thereby artificially raised the price of common shares. The complaint, however, does not link this alleged phenomenon to any cognizable motive on the part of the defendants to achieve such a result.

■ This failing is fatal. Plaintiffs must specify a motive, and it must " 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.' " *Id.* at 139 (quoting *inter alia Novak,* 216 F.3d at 307). As the Second Circuit recently noted: "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* (citing *Novak,* 216 F.3d at 307–08). Thus, allegations that defendants wanted the corporation to appear profitable or sought to keep stock prices high to increase officer compensation are insufficient, *id.* at 139–40 (citing *inter alia, Novak,* 216 F.3d at 307–08; *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994)), whereas an allegation that the defendants sought to inflate the market price while they sold their own shares would suffice. *Id.* (citing *Novak,* 216 F.3d at 308). *Accord, Chill,* 101 F.3d at 267; *San Leandro,* 75 F.3d at 814; *Acito,* 47 F.3d at 54.

Plaintiffs do not allege such profit-taking, or any other facts suggesting a motive to commit fraud. *Compare, e.g., Rothman,* 220 F.3d at 93–94 (plaintiffs pled specific facts demonstrating defendants' knowledge of the falsity of their own statement); *Stevelman,* 174 F.3d at 85–86 (senior officers sold large volume of shares after touting company's performance and prospects). In the absence of any direct allegation of motive or any suggestion of a factual basis for a particularized motive for fraud, the pleading in this case fails to meet this rigorous standard. Thus, the only potential basis for plaintiffs to satisfy the scienter requirement would be if they pled circumstances strongly suggesting "conscious misbehavior or recklessness." This too they fail to do.

■ The Second Circuit has noted that "[w]here motive is not apparent"—as in this case—"it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.' " *Kalnit,* 264 F.3d at 142 (quoting *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. 1987)). This test is not easily met. As the Second Circuit has noted:

> To survive dismissal under the "conscious misbehavior" theory, the [plaintiffs] must show that they alleged reckless conduct by the [defendants], which is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."

*In re Carter–Wallace Secs. Litig.,* 220 F.3d 36, 39 (2d Cir.2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)).

In this case the defendants premise their scienter theory entirely on the contention that the defendants' use of the cash-in method for valuing the company's interest in the cash reserves assigned to over-collateralize the securitized loan pools violated the GAAP. The cash-in valuation method is alleged to have violated the GAAP as of January 1, 1997, the effective date of FASB Statement No. 125. Plaintiffs' argument on this point is unpersuasive.

We start by noting that an allegation of repeated violations of the GAAP is not, by itself, sufficient to plead conscious misbehavior. *See, e.g., Novak,* 216 F.3d at 309; *Stevelman,* 174 F.3d at 84–85; *Chill,* 101 F.3d at 270. *Accord, e.g., In re Comshare Inc. Secs. Litig.,* 183 F.3d 542, 553 (6th Cir.1999). The plaintiffs must plead additional facts that would, at the least, support the required strong inference of fraud or recklessness. *See, e.g., Novak,* 216 F.3d at 309 (citing *Chill,* 101 F.3d at 270). Thus, plaintiffs in this case must offer specific factual allegations that, if true, would show that the defendants' conduct was " 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Rothman,* 220 F.3d at 90 (quoting *Rolf,* 570 at 47).

Plaintiffs fail to allege such facts. Indeed, the facts, as pled, suggest the contrary.

First, from the complaint and the documents integral to it,[7] it is apparent that the accounting principle on which plaintiffs rely was not a long-standing, well-recognized rule. Indeed, it was not promulgated and effective until January 1, 1997, when FASB Statement No. 125 took effect. Second, the cited FASB Statement did not itself explicitly impose a rule that collateralizing assets must be booked on a cash-out basis, nor did it refer to cash reserves or other forms of collateralization. Rather, it simply instructed the transferor of securitized receivables to treat all pertinent assets on the basis of "fair value", and it referred in very broad terms to a variety of general considerations and approaches for doing so. (*See* Compl. at ¶¶ 55–56; Pltffs' LFC Memo at Ex. B).[8]

Third, it is evident from the face of the FASB statement and from what transpired after its issuance, that this document did not unambiguously dictate a rule with respect to the cash-in/cash-out question. Indeed, as plaintiffs themselves recount, on December 28, 1998—nearly two years af-

**7.** We note that plaintiffs submit, with their motion papers, a statement by an analyst from the Securities Exchange Commission reporting the Commission staff's interpretation of FASB Statement No. 125. (Pltffs' LFC Memo at Ex. B). Both sides advert to this document, which plainly is integral to plaintiff's claim, since it specifies a reading of the FASB Statement that plaintiffs squarely rely upon in this case and that apparently led to LFC s restatement of earnings less than three months later. We therefore refer to it in our analysis.

**8.** The portion of the FASB Statement quoted by plaintiffs reads as follows:

If quoted market prices are not available, the estimate of fair value shall be based on the best information available in the circumstances. The estimate of fair value shall consider prices for similar assets and liabilities and the results of valuation tech-

niques to the extent available in the circumstances. Examples of valuation techniques include the present value of estimated expected future cash flows using a discount rate commensurate with the risks involved, option-pricing models, matrix pricing, option-adjusted spread models, and fundamental analysis. Valuation techniques for measuring financial assets and liabilities and servicing assets shall be consistent with the objective of measuring fair valve. Those techniques shall incorporate assumptions that market participants would [ ] use in their estimates of values, future revenues, and future expenses, including assumptions about interest rates, default, prepayment, and volatility. In measuring financial liabilities and servicing liabilities at fair value by discounting estimated future cash flows, [the] objective is to use discount rates at which those liabilities could be settled in an arms-length transaction.

(Compl. at ¶ 56).

ter the effective date of FASB Statement No. 125—the SEC staff felt obliged to provide clarification, in the form of remarks by Mr. Robert Uhl, a Professional Accounting Fellow in the Office of the Chief Accountant for the Commission. In the course of his comments, Mr. Uhl addressed a number of issues that had apparently been noted regarding the interpretation of Statement No. 125, including the treatment of cash reserves, and his comments plainly reflected the understanding of the Commission staff that clarification was needed.[9] Fourth, there is no dispute that LFC complied with the clarification offered by the Commission staff, and did so within less than three months after Mr. Uhl's remarks, when it restated

its financials for the period governed by FASB Statement No. 125.

This set of circumstances is entirely antithetical to the notion that defendants engaged in conscious misconduct or reckless behavior, at least as judged by the standards applied by our circuit court. Indeed, this pattern of facts is similar to the circumstances found in the Second Circuit's decision in *Stevelman*, in which the Court concluded that the plaintiff had failed to allege conscious or reckless misbehavior by the defendant despite repeated, and arguably blatant, accounting misstatements. A closer examination of the court's reasoning in *Stevelman* demonstrates why the pleadings in this case are

9. Mr. Uhl's pertinent comments included the following:

Regardless of whether the credit enhancing interest is accounted for as a retained interest or new interest, the transferor is required to determine the fair value of the cash reserve account or subordinated interest. This fair value is used either to allocate the previous carrying amount to a retained interest or for initial recognition of a new interest. Two methods have arisen in practice for determining the fair value of credit enhancements involving cash reserves: the cash-in method and the cash-out method. The cash-in method assumes the cash held by the securitization vehicle is available to the transferor when cash is deposited in the reserve account (hence the term, "cash-in"). Thus, this method measures the value of the transferor's interest in the cash from the date the securitization vehicle receives or is expected to receive the cash to the date of the transfer of the financial assets. If the trust receives the cash to be held in reserve on the date of the transfer, the cash-in method measures the fair value of the interest at its face amount (amount of cash in the reserve account). The cash-out method measures the value of the transferor's interest by discounting the transferor's interest in the cash held by the securitization vehicle from the expected date when the cash will become available to or paid out to the transferor to the date of

the transfer of the financial assets (hence the term, "cash out").

The staff has been asked whether both methods, cash-in and cash-out, provide acceptable estimates of fair value. The staff has concluded that the cash-out method and not the cash-in method is consistent with the definition of fair value. In estimating fair value, the expected cash flows should be discounted from the period in which the transferor expects to receive the cash, thus taking into consideration the period of time the asset is restricted. In other words, discounting the expected cash flows from the period in which the cash is deposited or expected to be deposited in the reserve account is not a method consistent with the concept of fair value.

(Pltffs' Memo, Ex. B, at second page). After addressing an additional area of inquiry concerning use of discount rates and default assumptions, Mr. Uhl advised that the staff "believe[d] its views are consistent with the tentative conclusions reached by the FASB staff in the draft FASB 125 Q & A—Second Edition", and that it would not provide a method of transition for companies to bring themselves into compliance with the advice that had been given. He did observe, however, that when the guidance was "clear", the changes should be made retroactively, citing as an example his comments about the use of the cash-out method. (*Id.*, Ex. B at second page).

insufficient to support a reckless behavior claim.

The defendant company in *Stevelman*, Alias Research Inc., was a developer of computer software. It reported very substantial increases in revenue and net income for 1990 and for the first two quarters of 1991, supposedly based on heroic efforts by its direct and distributor sales forces. These announcements, coupled with optimistic general predictions for the future, in turn led to a rise in the price of its shares. 174 F.3d at 81–82.

In the Fall of 1991, Alias announced its expectation that it would post a loss for the third quarter and referred in general terms to a plan to slow corporate growth. At the conclusion of fiscal year 1991, the company announced, by its annual 10–K, that it was restating its financials for the last three quarters of 1991, because it was changing its method of accounting for revenues from certain distributors. The change involved recognizing revenues from those distributors only on their sale of software, rather than booking it when the software tapes were first shipped to the distributors. As a consequence of this retroactive change, the reported income for 1991 dropped substantially, with reduced profits for the first half of the year and increased losses for the second half. Not surprisingly, this announcement led to a sharp drop in stock prices, and the filing of a section 10(b) lawsuit. Plaintiffs' complaint focused on the accounting change and alleged that the old system had violated GAAP because company officials had known or had been reckless in not knowing that there was no reasonable likelihood that Alias would receive timely payment, or indeed any payment, from the distributors. *Id.* at 82–83.

Although the Second Circuit accepted the premise that the prior mode of accounting for revenues from the distributors had violated GAAP and industry practice, it concluded that neither these violations nor the fact that the misleading statements had been repeated "in at least seven public filings and press releases" sufficed to plead a section 10(b) claim premised on conscious misbehavior or recklessness. *Id.* at 83–85. In so ruling, the court concluded that the misstatements had resulted from (1) a violation of GAAP, which is not itself a basis for liability, and (2) overly optimistic projections, which are also insufficient for section 10(b) liability. *Id.* at 84–85.

In the current case, plaintiffs have no more compelling argument than did the *Stevelman* plaintiffs. First, as noted, the specific accounting rule in question was not made unambiguously known until December 1998, and LFC conformed to it promptly thereafter. In contrast, in *Stevelman* there was no indication that the governing accounting principle had ever been in doubt. Second, to the extent that the reserve funds posted by LFC were serving as protection for payment of the mortgages by the mortgagees, the company's treatment of those monies can be analogized to the handling by Alias of the reported, but not yet realized, revenues from the distributors. LFC was required to determine a "fair value" for the reserve funds, and this process could fairly be viewed as turning on an assessment as to the likelihood that the principal and interest due on the pooled mortgages would be paid. Hence, this issue too can be viewed as involving a predictive exercise by the company, which, as the Circuit held in *Stevelman*, does not trigger section 10(b) liability even if the predictions are unreasonable. Finally, we note that in *Stevelman* plaintiffs alleged that, during the class period, senior officers of Alias had sold substantial quantities of their own shares in the company even while overstating revenues. Based on that fact, the Circuit Court held that plaintiffs had suffi-

ciently alleged both motive and opportunity for fraud, and in that manner alone had satisfied the scienter pleading requirement, even though that added fact did not save plaintiffs' pleading with respect to conscious misbehavior and recklessness. *Id.* at 85–86. In this case, however, there is no comparable allegation of profit-taking by corporate officials.

In sum, we conclude that plaintiffs' allegations here fail to state a claim for violation of section 10(b), because they are inadequate to plead the requisite scienter. *Accord, In re Brightpoint, Inc. Secs. Litig.,* 2001 WL 395752, *28–29 (S.D.Ind. March 29, 2001) (financials restated after change in accounting rules). *Mortensen v. AmeriCredit Corp.,* 123 F.Supp.2d 1018, 1025–27 (N.D.Tex.2000), *aff'd,* 240 F.3d 1073 (5th Cir.2000) (restatement after December 1998 clarification of FASB Statement No. 125). *See also In re Baker Hughes Secs. Litig.,* 136 F.Supp.2d 630, 649–50 (S.D.Tex.2001) (restatement of financials following accounting errors and violation of GAAP); *In re Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d 251, 269–70 (D.Mass.2001) (financials restated). For that reason, this claim should be dismissed.[10]

## C. *The Section 20(a) Claim*

Plaintiffs also assert a claim under section 20(a) of the Securities Exchange Act against a number of the senior officers of LFC. To plead such a claim, they must allege both a primary violation of section 10(b) and control-person status by the defendants. *See, e.g., Suez Equity Investors, L.P v. Toronto–Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001). Defendants argue

that the claim fails because plaintiffs satisfy neither requirement.

We have already concluded that the pleading of the section 10(b) violation is deficient. On that basis alone, dismissal is warranted. *See, e.g., Brown v. Hutton Group,* 795 F.Supp. 1317, 1324 (S.D.N.Y. 1992). We therefore need not consider the adequacy of plaintiffs' allegations as to the personal responsibility of each of the individual defendants named in this claim for the underlying violation.

## D. *The Section 11 Claim*

■ Plaintiffs press a claim against LFC and several of its principal officers for violation of section 11(a) of the Securities Act. That provision states, in pertinent part:

> In case any part of the registration statement .... contained an untrue statement of material fact or omitted to state a material fact ... any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [all signers of the registration statement, all directors, accountants, underwriters or others who certified the misstatement].

15 U.S.C. § 77k(a). This section goes on to provide that

> If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement,

---

**10.** In view of this conclusion, we need not reach defendants' further arguments (1) that the section 10(b) claim is inadequately pled against the individual defendants because plaintiffs do not specify those defendants' particular involvement and (2) that it is also legally deficient by virtue of plaintiffs' failure sufficiently to plead loss causation. *See generally Castellano v. Young & Rubicam Inc.,* 257 F.3d 171, 185–89 (2d Cir.2001) (specifying standards for loss causation).

then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

*Id.*

█ As suggested by the wording of this provision, a *prima facie* case for liability requires only the presence of materially false representations in a registration statement and a purchase of shares. *See, e.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The plaintiff need not prove fraudulent intent or recklessness, or indeed any other state of mind on the part of the issuer of the new shares or any other defendants, although the non-issuer defendants may assert and prove a due-diligence defense. *See, e.g., id.* at 381–82, 103 S.Ct. 683; *In re NationsMart Corp.,* 130 F.3d 309, 315 (8th Cir.1997).

The statute does limit its reach, however, to misstatements in registration statements for publicly-offered shares and to purchasers of "such security." This terminology has long been recognized as imposing strict liability only with respect to shares issued pursuant to the registration statement. *See, e.g., In re College Bound Consol. Litig,* 1994 WL 172408, *2 (S.D.N.Y. May 4, 1994); *Unicorn Field, Inc. v. Cannon Group, Inc.,* 60 F.R.D. 217, 226 (S.D.N.Y.1973). Indeed, the Supreme Court has recognized that "the primary innovation of the [1933 Securities] Act was the creation of federal duties—for the most part, registration and disclosure information—in connection with public offer-

ings." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 562, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Thus, the courts have repeatedly held that the purchase referred to in section 11 must be "pursuant to" the registration statement, and that the plaintiff must both plead and prove that he made such a purchase. *See, e.g., Barnes v. Osofsky,* 373 F.2d 269, 271–72 (2d Cir.1967); *In re AES Corp. Secs. Litig.,* 825 F.Supp. 578, 592 (S.D.N.Y.1993); *Lorber v. Beebe,* 407 F.Supp. 279, 286 (S.D.N.Y.1975).

Defendants' principal attack on plaintiffs' pleading of the section 11 claim rests on their contention that plaintiffs fail to allege facts demonstrating that they have standing under this precedent. This argument takes two forms. First, they note that the named plaintiffs purchased their shares long after the IPO, with two buying on the open market sometime in 1998 [11] and the other buying in February 1999. According to defendants, a plaintiff may not sue under section 11 unless he purchased directly in the IPO, which the named plaintiffs concededly did not do. (LFC Defts' Memo at 19) (citing *Gustafson,* 513 U.S. at 564, 115 S.Ct. 1061). Second, defendants observe that, even if such a direct purchase is not required, at a minimum the plaintiffs must purchase shares traceable to the IPO—that is, shares issued in the IPO that featured the assertedly inaccurate registration statement. According to defendants, since plaintiffs do not sufficiently allege that they purchased such shares, the complaint is defective. (*Id.* at 19–20).

Plaintiffs resist these arguments. First, they contend that defendants' reading of *Gustafson,* which directly addressed only section 12 of the 1933 Act, is unjustified, and that for purposes of section 11 the

---

11. The certification annexed to the complaint leaves uncertain the specific month in which

Mr. and Mrs. Rastenis purchased their shares.

plaintiff may have purchased in the so-called after market. (Pltffs' LFC Memo at 12–13).[12] Second, they assert as a factual matter that their shares are traceable to the IPO. (*Id.* at 12).

We reject defendants' contention that *Gustafson* changed the law in this circuit with respect to section 11. In *Barnes* the Second Circuit had ruled that a plaintiff must establish that the shares he purchased were traceable to the IPO, a requirement that plaintiffs do not contest in this lawsuit. 373 F.2d at 270–72. Although *Gustafson* subsequently held that a claimant under section 12 must have purchased shares held out to the public for sale, its reasoning does not extend to the issue of standing under section 11.[13] The language of that provision is both different and quite clear in its intent, requiring only that the shares in question originate in the IPO. This point has been ably made in a series of decisions in this district, and, finding no reason to rehash their analysis, we simply endorse their reasoning. *See e.g., In re Complete Mgt., Inc. Secs. Litig.,* 153 F.Supp.2d 314, 338–39 (S.D.N.Y.2001); *In re Livent Inc. Noteholders Secs. Litig.,* 151 F.Supp.2d 371, 434–36 (S.D.N.Y.2001); *Milman v. Box Hill Systems, Corp.,* 192 F.R.D. 105, 106–09 (S.D.N.Y.2000); *Adair v. Bristol Tech. Sys., Inc.,* 179 F.R.D. 126, 131–33 (S.D.N.Y.1998).

Since, however, the plaintiffs must have purchased shares traceable to the IPO, and since that element must be pled, the next question is whether the complaint makes this necessary allegation. In fact, it does, albeit in fairly conclusory terms. (*See* Compl. at ¶¶ 7–8). Although the defendants complain about the conclusory

nature of the allegation, they offer no legal authority for the proposition that more is required. Since this element of the claim is governed by Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief", we see no defect in plaintiffs' allegations. *See generally Leatherman v. Tarrant County,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

In resisting this conclusion, defendants point to the plaintiffs' purchase certifications, which provide the date of their purchases. Defendants appear to imply that the length of time between the IPO and the purchases precludes traceability. We disagree. If the shares were issued in the 1997 IPO, they may be traced to it, irrespective of when plaintiffs bought. If, however, the plaintiffs are unable, as a matter of fact, to establish the traceability of the shares, their claim will be subject to dismissal by summary judgment.

The weakness of defendants' argument on this point is underscored by the fact that the statute specifically addresses the potential significance of a delay between the IPO and the purchase. As noted, it provides that if the plaintiff bought only after the issuance of a post-IPO financial report covering at least twelve months, the plaintiff will be required to establish reliance on the registration statement. The clear implication of this provision is that a time lag in buying after the IPO is not, in itself, fatal to the plaintiffs' claims.

The LFC defendants' remaining attack on the section 11 claim is that it fails to plead fraud with the particularity re-

---

**12.** Plaintiffs also allude to a request to amend the complaint to add a plaintiff who actually purchased during the IPO. (*Id.* at 12). A review of the docket sheet of this case reflects no such motion.

**13.** The narrow issue in *Gustafson* was whether a private contract of sale amounted to a "prospectus" within the meaning of section 12. The Supreme Court held that it did not because the purchased shares had not been held out to the public. 513 U.S. at 584, 115 S.Ct. 1061.

quired by Rule 9(b). The short answer to this contention. is that fraud is not an element of a section 11 claim. *See, e.g., In re Livent,* 151 F.Supp.2d at 408–09. Moreover, plaintiffs do not invoke allegations of fraud in pleading this claim. *(See* Compl. at ¶¶ 62–69). Necessarily, then, the special pleading requirements of Rule 9(b) do not apply here. *See, e.g., In re NationsMart,* 130 F.3d at 315; *In re Livent,* 151 F.Supp.2d at 429–30; *In re In-Store Advertising Secs. Litig.,* 878 F.Supp. 645, 650 (S.D.N.Y.1995); *Nelson v. Paramount Communications, Inc.,* 872 F.Supp. 1242, 1246 (S.D.N.Y.1994).[14]

### E. *The Section 15 Claim*

 The LFC defendants' final challenge is to the adequacy of plaintiffs' pleading of "controlling person" status under section 15 of the Securities Act. We are not persuaded.

The complaint names Messrs. Perl, Mills and Skipper as defendants on this claim. It identifies Perl as the President, Chief Executive Officer and a Director of LFC, and further specifies that he was aware of "the essential element's of Life Financial's operations and accounting methods", and was co-responsible for the company's choice of accounting rules. (Compl. at ¶¶ 11, 59). It specifies that Mills was Executive Vice President, Chief Financial Officer, Treasurer and a Director of LFC, and that he was "responsible for assu[r]ing that the publicly reported financial statements were accurate and in compliance with GAAP." *(Id.* at ¶¶ 12, 59). As for Skipper, plaintiffs allege that he was the Chairman of the Board. *(Id.* at ¶ 13). Apart from identifying the senior roles of these three defendants, plaintiffs allege that each of them. signed the

registration statement. *(Id.* at ¶¶ 11–13). Finally, and more broadly, the complaint asserts that, "as officers and directors, Defendants Perl, Mills and Skipper had the power and authority to control the actions of [LFC] and they did in fact exercise such power." (Compl. at ¶ 72).

These allegations suffice to meet the Rule 8 pleading requirement for stating a claim under section 15. *See, e.g., In re APAC Teleservice, Inc. Secs. Litig.,* 1999 WL 1052004, *11–12 (S.D.N.Y. Nov.19, 1999); *Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1315 (S.D.N.Y. 1996). The operative element is control of the company's actions, and plaintiffs' general allegation of such control, coupled with the more specific identification of each defendant's position, the scope of his authority and the fact that each signed the registration statement is adequate to link each defendant to the wrongdoing for pleading purposes. *See, e.g., In re Livent,* 151 F.Supp.2d at 436–37 (citing cases).

### II. . *The Keefe Motion*

 The motion by defendant Keefe Bruyette is addressed solely to the section 11 claim. Defendant argues that, on the face of the complaint, plaintiffs lack standing and that plaintiffs do not allege that defendant was aware of the alleged misstatements in the registration statement.

Keefe. Bruyette's standing argument fails for the reasons already explained. Its alternative challenge to the complaint is also misguided.

As we have noted, section 11 requires the plaintiffs to plead and prove misstatements in a registration statement and purchase of shares derived from the offering that the registration statement covered.

14. We note that some courts have come to a contrary conclusion, *see Griffin v. Paine-Webber, Inc.,* 84 F.Supp.2d 508, 513 (S.D.N.Y. 2000) (noting disagreements among courts), but we see no persuasive basis for applying Rule 9(b) to allegations that anchor a claim for which fraud itself is not an element.

Plaintiffs need not prove any knowledge or intent on the part of the company, the signers of the registration statement, or the non-corporate defendants specified in sections 11(a)(4) and (5). Rather, the statute provides a due-diligence defense to all defendants except the issuer, and they bear the burden of invoking and proving that defense. 15 U.S.C. §§ 77k(b)(2) & (3). *See, e.g., In re Livent,* 151 F.Supp.2d at 408–09. Since the due-diligence defense (and related defenses found in section 11(b)) are not elements of the plaintiffs' case, there is no requirement that the plaintiffs anticipate the invocation of such defenses in their complaint.

## CONCLUSION

For the reasons stated, we recommend that the LFC defendants' motion to dismiss be granted with respect to the plaintiffs' section 10(b) and 20(a) claims under the Securities Exchange Act, and that their motion (and that of Deloitte and Touche) be denied with respect to their section 11 and 15 claims under the Securities Act. We further recommend that the dismissal motion of Keefe Bruyette be denied. Finally, because it is at least conceivable that plaintiffs might be able to remedy the deficiencies in their complaint with regard to their section 10(b) and 20(a) claims, the dismissal should be without prejudice to the service and filing of an amended complaint within thirty days following dismissal. *See, e.g., Acito,* 47 F.3d at 55.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Constance B. Motley, Room 2540, 500 Pearl Street, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Oct. 2, 2002.