101 F.3d 263
 65 USLW 2416, Fed. Sec. L. Rep. P 99,353,
36 Fed.R.Serv.3d 437
 Daniel CHILL, Plaintiff-Appellant,
Paul Kay, Giza Schectman, Mayer Ballas, Douglas Marshall,
Steven J. Weiss, M.D. Profit Sharing Plan and
Michelle Ruder, Appellants,
v.
GENERAL ELECTRIC COMPANY, Defendant-Appellee.
 No. 1534, Docket 95-9175.
 United States Court of Appeals,
Second Circuit.
 Argued June 27, 1996.
Decided Nov. 27, 1996.
 
 Abraham Rappaport, Morris & Morris, Wilmington, DE, and Joel Seligman, University of Arizona College of Law, Tucson, AZ (Irving L. Morris, Karen L. Morris, Abraham Rappaport, Patrick F. Morris, Seth D. Rigrodsky, Morris & Morris, New York City; Stull, Stull & Brody, New York City; Weiss & Yourman, New York City; Schiffrin & Craig, Ltd., Bala Cynwyd, PA; Wolf Haldenstein Adler Freeman & Herz, New York City; Timothy J. Dennin, P.C., New York City; Krause & Kalfayan, San Diego, CA, of counsel), for Plaintiff-Appellant and Appellants.
 Louis B. Kaden, Davis Polk & Wardwell, New York City (Robert F. Wise, Jr., Davis Polk & Wardwell, New York City, of counsel), for Defendant-Appellee.
 Before: MINER, JACOBS and PARKER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-appellant Daniel Chill and appellants (collectively, the "plaintiffs") appeal from a judgment entered in the United States District Court for the Southern District of New York (Keenan, J.) dismissing the complaint and denying plaintiffs leave to amend. The district court found that plaintiffs failed to allege facts that supported their claim that defendant-appellee General Electric Company ("GE") committed securities fraud in reporting the false profits generated by a bond trader at its subsidiary, Kidder, Peabody & Co., Inc. ("Kidder"). For the reasons that follow, we affirm the judgment of the district court.BACKGROUND
 
 
 2
 GE is a large and diverse public company with 12 major, separately-managed operating businesses. One of these 12 businesses is GE Capital Services, Inc. ("GE Capital"), which is GE's financial services unit. At the time of the events at issue in this action, GE Capital itself was comprised of 24 separate businesses, one of which was Kidder, a full-service investment bank and securities broker-dealer. Each of these separate businesses reported their quarterly and annual financial results to GE, which reported the results of all its businesses on a consolidated basis.
 
 
 3
 GE had acquired 80 percent of Kidder for $620 million in 1986. Shortly thereafter, an insider trading scandal was exposed at Kidder, resulting in a $26 million fine paid to the Securities and Exchange Commission ("SEC") and the implementation of a compliance system at Kidder to detect fraudulent trading. Kidder's business declined, with losses of $53 million posted in 1989, and $54 million in 1990. In 1990, GE acquired the remaining 20 percent of Kidder in a $550 million bailout transaction. Following this transaction, Kidder began turning a profit, and did so throughout 1991, 1992 and 1993.
 
 
 4
 Beginning in late 1991, Orlando Joseph Jett, one of the traders at Kidder's government bond trading desk, allegedly began a scheme to generate false profits in order to increase his year-end, performance-based bonuses. Jett secretly entered thousands of fictitious STRIPs[1] trades into Kidder's computerized trading system. These entries made it appear as if Jett's trading activities were generating substantial profits for Kidder. These "phantom" trades, which were designed to be hidden from Kidder's management and auditors, existed only in Kidder's computers and generated only fictitious and unrealizable profits. Jett continued this scheme through March of 1994. In total, the false trades resulted in $350 million in false profits for Kidder, and over $10 million in performance-based bonuses for Jett. The scheme also masked Kidder's real STRIPs trading activities over this period, which resulted in actual losses in excess of $85 million.
 
 
 5
 In April of 1994, Kidder discovered Jett's scheme. Kidder informed GE Capital, and Jett was fired on April 17, 1994. GE announced on April 17, 1994 that it would take a one-time $350 million charge to its first quarter 1994 earnings to adjust for the false profits that had been recorded at Kidder from 1991 through 1994. GE and Kidder also announced that they had retained Gary G. Lynch, a former Director of Enforcement at the SEC, to conduct an internal investigation of Kidder and report on how the Jett scheme remained undetected despite Kidder's internal controls.[2] In addition, GE made changes in Kidder's top management.
 
 
 6
 Shortly after GE announced its discovery of the scheme, ten class action suits were filed, each on behalf of a class of those who had purchased GE stock during the year prior to the disclosure of the scheme. According to each complaint, the earnings of Kidder, and thus GE, had been overstated as a result of Jett's scheme and thereby had artificially inflated the market price of GE stock. Seven of these actions named GE as a defendant, and the other three actions named as defendants Kidder and several of its officers and directors (the "Kidder defendants").
 
 
 7
 Pursuant to an order of the district court, all the suits against GE were consolidated into one action, and all the suits against the Kidder defendants were consolidated into a separate action. The order of the district court also provided for discovery and the filing of an amended complaint in each action.
 
 
 8
 In October of 1994, the plaintiffs filed an amended complaint against GE. In their amended complaint, the plaintiffs alleged that they had purchased GE stock, or entered into put or call options for GE stock, between April 13, 1993 and April 17, 1994 (the "Class Period"), "based, inter alia, on materially false and misleading press releases and financial statements GE filed with the [SEC]." As stated in the complaint, "GE recorded hundreds of millions of dollars in profits throughout the Class Period it clearly knew or was wholly reckless in not knowing were manufactured out of thin air and that each quarter masked substantial trading losses totalling about $85 million in the aggregate." The plaintiffs alleged that "GE intentionally, knowingly or recklessly turned a blind eye to numerous 'red flags' ... alerting [GE] that the 'profits' Kidder appeared to be generating throughout the Class Period were fictive," in order "to justify its 1986 acquisition of Kidder." In addition, the plaintiffs alleged that "GE knowingly, intentionally or recklessly issued materially false and misleading statements regarding its financial controls system." Accordingly, the plaintiffs alleged that GE had engaged in securities fraud, in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.
 
 
 9
 On December 20, 1994, GE moved to dismiss the amended complaint for failure to state a claim. In its Opinion and Order dated October 4, 1995, the district court granted the motion.[3] The district court found that the plaintiffs had failed to allege facts that established scienter on the part of GE. The court further stated that "[t]he mere fact that GE's financial reporting was inaccurate does not establish scienter." The court stated that the plaintiffs "fail to successfully allege that GE's reporting of [Kidder's false] earnings was the type of highly unreasonable or reckless activity that may give rise to actionable securities fraud." According to the court, "the red flags [noted by the plaintiffs] might have been warnings to Kidder's internal auditors or to any outside accountants, but that does not constitute intentional, knowing or reckless activity on GE's part." The court concluded that the plaintiffs
 
 
 10
 fail to allege strong circumstantial evidence of conscious misbehavior or recklessness by the defendant that would approximate intentional misconduct. Kidder had its own internal control mechanisms and GE had a right to rely on Kidder to monitor its own financial reporting. To so rely is not evidence of recklessness. It is evidence of mismanagement at most and mismanagement is not necessarily securities fraud.
 
 
 11
 The court also found that GE's alleged violations of Generally Accepted Accounting Principles ("GAAP") and SEC accounting regulations did not support a section 10(b) claim, because the plaintiffs failed to successfully allege fraudulent intent. Accordingly, the district court found that the plaintiffs failed to state a section 10(b) claim.
 
 
 12
 The court declined to grant the plaintiffs leave to replead the complaint. The court stated that it "does not believe that Plaintiffs could ever successfully replead the scienter element of a Section 10(b) claim and for that reason the Court will not permit Plaintiffs to replead their Complaint." This appeal followed.
 
 DISCUSSION
 
 13
 I. Failure to Allege Scienter on the Part of GE
 
 
 14
 In order to state a cause of action under section 10(b) and Rule 10b-5, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995) (alteration in original and quotation omitted). The plaintiffs argue that the district court erred in finding that they failed to allege facts sufficient to satisfy the scienter element of a section 10(b) cause of action. We disagree.
 
 
 15
 We review de novo the district court's dismissal of an action pursuant to Fed.R.Civ.P. 12(b)(6), and accept as true the facts alleged in the complaint. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 765 (2d Cir.1994), cert. denied, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995); see Acito, 47 F.3d at 51. "Generally, we will uphold a district court's dismissal of a claim only if it appears that the plaintiff can prove no set of facts upon which relief may be granted." Acito, 47 F.3d at 51 (quotation omitted).
 
 
 16
 When the complaint contains allegations of fraud, Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud ... be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." (Emphasis added.) Therefore, the actual fraudulent statements or conduct and the fraud alleged must be stated with particularity, see Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476-77 (2d Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1836, 134 L.Ed.2d 939 (1996); Acito, 47 F.3d at 51, whereas the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity, see Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir.1994). We apply the more general standard to scienter for the simple reason that "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir.1987).
 
 
 17
 Despite Rule 9(b)'s lower standard for scienter, this Court has stated that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.' " Acito, 47 F.3d at 52 (quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990)). Plaintiffs still have the " 'burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter.' " Cohen, 25 F.3d at 1173 (quoting Fluor, 808 F.2d at 962). Accordingly, we have held that "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." Acito, 47 F.3d at 52 (emphasis added); see S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp., 84 F.3d 629, 634 (2d Cir.1996); In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).
 
 
 18
 A plaintiff can establish a strong inference of fraudulent intent in two ways: "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994); see S.Q.K.F.C., 84 F.3d at 634; San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 813 (2d Cir.1996); Acito, 47 F.3d at 52. Plaintiffs make allegations under each alternative. We hold that under both approaches, plaintiffs fail to allege facts sufficient for us to infer the requisite scienter.
 
 A. Motive and Opportunity
 
 19
 The first method of pleading scienter is to allege facts that show both motive and opportunity to commit fraud. See Acito, 47 F.3d at 52. It is not disputed that GE had the opportunity to defraud plaintiffs as they allege.[4] See, e.g., Philip Morris, 75 F.3d at 813 (indisputable that key directors and officers have ability to manipulate their company's stock price); In re Time Warner, 9 F.3d at 269 (same).
 
 
 20
 Plaintiffs allege that "GE's interest in justifying to its shareholders its over $1 billion investment in Kidder gave GE a motive to willfully blind itself to facts casting doubt on Kidder's purported profitability." However, GE's motive in justifying its substantial investment in Kidder is not adequate to establish GE's scienter.
 
 
 21
 We have stated that "[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Shields, 25 F.3d at 1130. The motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not "entail concrete benefits." See, e.g., Philip Morris, 75 F.3d at 813-14 (alleging that the defendants were motivated by a desire to maintain the company's credit rating); Acito, 47 F.3d at 54 (alleging that "defendants were motivated to defraud the public because an inflated stock price would increase their compensation"). In both Acito and Philip Morris we held that, "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Acito, 47 F.3d at 54; see Philip Morris, 75 F.3d at 814; see also In re Crystal Brands Sec. Litig., 862 F.Supp. 745, 749 (D.Conn.1994) (finding that allegations of a company's motive to "maintain good relations with suppliers, retailers and lenders" are flawed because "they pertain to virtually any company that manufactures and distributes goods").
 
 
 22
 In this case, GE obviously would want to justify its investment in Kidder and have that investment appear profitable, but such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.[5] Thus, we agree with the district court that such a generalized motive does not support a strong inference of fraudulent intent.[6]
 
 
 23
 The plaintiffs also claim that the district court's determination that they failed to sufficiently allege a motive on the part of GE is inconsistent with the court's finding that the plaintiffs' motive theories were sufficient in their action against the Kidder defendants. However, in In re Kidder Peabody Securities Litigation, the district court simply stated that "Kidder arguably had a motive to either hide Jett's trading scheme or to recklessly disregard the warning signs of that scheme." No. 94 Civ. 3954(JFK), 1995 WL 590624, at * 5 (S.D.N.Y. Oct. 4, 1995). In each instance, the district court's determination that the Kidder defendants "arguably" had a motive does not necessarily mean that the parent company, GE, had any motive. Ultimately, whether Kidder defrauded plaintiffs and whether its parent, GE, defrauded plaintiffs are different questions.
 
 
 24
 Accordingly, we hold that the district court properly determined that the plaintiffs failed to allege facts sufficient to show motive and opportunity to commit fraud.
 
 B. Circumstantial Evidence of Recklessness
 
 25
 A plaintiff in a fraud action may also plead scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito, 47 F.3d at 52 (quotation omitted). The plaintiffs argue that GE's financial reporting was reckless in two respects. First, they contend that GE was reckless in its failure to heed the "red warning flags" coming from Kidder that signaled Kidder's falsification of profits. Second, they argue that GE was reckless in relying on Kidder to monitor its own financial reporting. The district court found plaintiffs' factual allegations insufficient to infer the requisite recklessness.[7] We agree.
 
 
 26
 In Rolf v. Blyth, Eastman Dillon & Co., we stated that "[r]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." 570 F.2d 38, 47 (2d Cir.1978) (alteration in original and quotation omitted), op. am., Nos. 77-7104, 77-7124, 1978 WL 4098 (2d Cir. May 22, 1978), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." Goldman v. McMahan, Brafman, Morgan & Co., 706 F.Supp. 256, 259 (S.D.N.Y.1989); see Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir.1991).
 
 
 27
 The facts alleged to support recklessness must be "strong circumstantial evidence" of that recklessness. Acito, 47 F.3d at 52. This showing of recklessness must be such that it gives rise to a "strong inference of fraudulent intent." Shields, 25 F.3d at 1128; see also Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 121 (2d Cir.1982) (recklessness "must, in fact, approximate an actual intent to aid in the fraud being perpetrated"); In re Leslie Fay Cos. Sec. Litig., 835 F.Supp. 167, 173 (S.D.N.Y.1993) (recklessness must be shown to such an extent that a reasonable finder of fact could actually infer fraudulent intent from it).
 
 
 28
 Plaintiffs' first and central recklessness claim "is based on GE having made ... false statements recklessly, disregarding obvious indications the supposed earnings and profits were not--and could not have been--the result of the STRIPs trading activities to which they were attributed." Plaintiffs make several allegations designed to support their contention that the district court erred in rejecting their claim that GE was reckless in disregarding "red flags" coming from Kidder.[8]
 
 
 29
 The plaintiffs argue that they "have identified three distinct sources of specific facts--Kidder financial documents reviewed by GE, the Dammerman memoranda, and the history of GE's investment in its Kidder subsidiary--which together establish compelling circumstantial evidence of GE's recklessness." As regards the Kidder financial documents, the plaintiffs allege that "[d]uring the Class Period GE had before it financial information from Kidder that contained a host of red warning flags about the legitimacy of Kidder's supposed record results." According to the plaintiffs, these red flags included: (1) the huge increase in the dollar volume of trading at Kidder's government bonds trading desk in less than three years; (2) the large increase in reported profits from the first quarter of 1992 to March of 1994; (3) the lack of records of any cash being realized from these trades; and (4) the multi-billion dollar daily fluctuations in Kidder's balance sheet assets.
 
 
 30
 In addition to these red flags, the plaintiffs contend that GE should have been alerted to possible wrongdoing by monthly memoranda sent from Richard W. O'Donnell, Kidder's Chief Financial Officer, to Dennis D. Dammerman, the Chief Financial Officer at GE (the "Dammerman memoranda"). The plaintiffs argue that GE "disregarded specific information about unprecedented and dramatically increasing profitability of STRIPs trading at Kidder contained in" these memoranda. For instance, it was reported that, by the end of April of 1993, Kidder's government bond trading desk had "already exceeded its 1992 net income of $18.2 [million], with Treasury STRIPs trading being the principal driver of current profitability," and that by the end of December of 1993, net income from STRIPs trading for 1993 had reached $71.8 million, which was 26 percent of the total 1993 annual net income of Kidder's Fixed Income operations.
 
 
 31
 The plaintiffs contend that a comparison of the historical profits and the current profits of Kidder should have served as a warning to GE. The plaintiffs also contend that "[t]he magnitude and unprecedented increase in purported profits from STRIPs trading at Kidder ... were inexplicable given the fact, known throughout the financial investing industry, that by its very nature STRIPs trading typically generated no more than marginal profits at best." They argue that these "[a]dditional facts about Kidder, all of which were known to GE, provide a context that further supports the inference of GE's recklessness." The plaintiffs conclude that all of these facts mean that "GE blinded itself to numerous obvious signs that hundreds of millions of dollars of Kidder's profits were not the result of legitimate trading activities."
 
 
 32
 However, the facts alleged, if true, do not add up to circumstantial evidence of conscious misbehavior or recklessness. The plaintiffs' claim of deliberate blindness is not supported by their allegations. The plaintiffs do not demonstrate how the increased level of activity at Kidder, as reflected in GE's consolidated financial records, would necessarily have indicated to GE that there was misconduct. The fact that GE did not automatically equate record profits with misconduct cannot be said to be reckless. As GE points out, "successfully managed enterprises can earn record (and therefore 'extraordinary') profits at any given point in time and a well managed business that is growing should post 'record' profits on a regular basis." Furthermore, the fact that financial documents showed larger positions in these market securities would support GE's acceptance of the larger profits. The fact that cash was not realized from these trades is equally ambiguous in import. There is no evidence that GE would normally expect to see more than accounting, or paper, profits from its third-tier subsidiaries. The Dammerman memoranda simply show that the STRIPs trading was very successful. The plaintiffs do not show that the memoranda raised compliance concerns or other potential problems.
 
 
 33
 Given the significant burden on the plaintiff in stating a fraud claim based on recklessness, the success, even the extraordinary success, of a subsidiary will not suffice in itself to state a claim that the parent was reckless in failing to further investigate. Fraud cannot be inferred simply because GE might have been more curious or concerned about the activity at Kidder. See Shields, 25 F.3d at 1129 (allegations "strongly suggest[ ] that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud"); see also Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir.1994) ("The fact that the company was in violation of federal law by its ownership of the financial institution stock may reflect poorly on its management, but in no way demonstrates a 10b-5 violation."). In sum, the plaintiffs fail to allege facts to support a finding that GE was faced with sufficient information such that its failure to further investigate Kidder's STRIPs trading practices constituted recklessness.
 
 
 34
 Plaintiffs also contend that GE acted recklessly in relying on Kidder to monitor the accuracy of its own financial reporting. They refer to GAAP provisions and SEC regulations that required GE to accurately report Kidder's financial information.[9] However, the plaintiffs do not provide legal support for their contention that violations of these provisions are adequate proof of recklessness. Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim. See, e.g., Decker, 681 F.2d at 120-21; SEC v. Price Waterhouse, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (stating that the recklessness standard in a securities fraud action "requires more than a misapplication of accounting principles").
 
 
 35
 In fact, this precise claim was raised in a case where plaintiffs pointed to the fact that the parent corporation "publicly recognized that it had adopted financial statements from [the subsidiary] based on erroneous accounting practices and restated its financials." Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594(LAP), 1996 WL 88570, at * 15 (S.D.N.Y. Feb. 29, 1996). The district court stated that "[i]ntentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls." Id. We agree with the statement of the district court and conclude that the plaintiffs have failed to meet the standard.
 
 
 36
 In sum, we affirm the district court's finding that the plaintiffs did not allege facts that showed strong circumstantial evidence of recklessness on the part of GE. Accordingly, the district court properly determined that the plaintiffs failed to state a securities fraud claim in connection with the allegedly false financial statements issued by GE.
 
 
 37
 II. GE's Alleged Misrepresentations of its Financial Controls
 
 
 38
 The plaintiffs next argue that the district court erred in dismissing their complaint without properly addressing their claim that GE fraudulently misrepresented the efficacy of its financial controls and auditing systems. This contention is without merit.
 
 
 39
 In claiming that GE misrepresented its financial controls, plaintiffs challenge statements that appeared in GE's 1993 Annual Report. These statements were as follows:
 
 
 40
 The financial data in this report, including the audited financial statements, have been prepared by management using the best available information and applying judgment. Accounting principles used in preparing the financial statements are those that are generally accepted in the United States.
 
 
 41
 Management believes that a sound, dynamic system of internal financial controls that balances benefits and costs provides the best safeguard for Company assets. Professional financial managers are responsible for implementing and overseeing the financial control system, reporting on management's stewardship of the assets entrusted to it by share owners and maintaining accurate records.
 
 
 42
 ....
 
 
 43
 The Audit Committee of the Board (consisting solely of Directors from outside GE) maintains an ongoing appraisal--on behalf of share owners--of the activities and independence of the Company's independent auditors, the activities of its internal audit staff, financial reporting process, internal financial controls and compliance with key Company policies.
 
 
 44
 (JA 79). Plaintiffs contend that these statements were fraudulent misstatements because, in fact, "GE's design, implementation and operation of its financial control systems, including its internal auditing process and financial reporting procedures, was inadequate," most notably in that "those systems failed to assure that immediate action was taken in response to the repeated red flags warning of financial irregularities at Kidder."
 
 
 45
 Regardless of the accuracy of these allegations, in order to state a securities fraud claim, plaintiffs must successfully allege the requisite scienter. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). GE has failed to allege the requisite scienter with regard to its claim that GE misrepresented the efficacy of its financial controls. Accordingly, the district court properly dismissed this claim.
 
 III. Denial of Leave to Amend the Complaint
 
 46
 Finally, plaintiffs contend that the district court erred in denying them leave to replead their complaint. We find no merit in this argument.
 
 
 47
 We review the denial of leave to replead a complaint for abuse of discretion. Philip Morris, 75 F.3d at 815. In general, "[l]eave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)," and "there must be good reason to deny the motion." Acito, 47 F.3d at 55. In the present case, in denying the plaintiffs leave to amend, the district court stated that it "does not believe that Plaintiffs could ever successfully replead the scienter element of a Section 10(b) claim and for that reason the Court will not permit Plaintiffs to replead their complaint." As we held in Acito, futility is a "good reason" to deny leave to amend. Id.
 
 
 48
 Plaintiffs argue that they were denied leave to amend after they had only been permitted "limited document discovery." We disagree. Plaintiffs had ample opportunity to collect the facts concerning Jett's trading scheme in order to attempt to show scienter on the part of GE. They had the Lynch Report to review in drafting their amended complaint. They obtained discovery from Kidder and GE after filing their amended complaint, and used the Dammerman memoranda in responding to GE's motion to dismiss. We agree with the district court that there is no indication that plaintiffs could replead the complaint so as to establish GE's scienter. Therefore, the district court properly exercised its discretion in denying plaintiffs leave to amend.
 
 CONCLUSION
 
 49
 For the foregoing reasons, the judgment of the district court is affirmed in all respects.
 
 
 
 [1]
 "STRIPs" are the individual interest payment components of a United States Treasury bond, payable semi-annually over the life of the bond. For instance, a 30-year Treasury bond can be broken down into 60 individual STRIPs and one zero-coupon bond upon which principal payment is due from the government upon maturity. These STRIPs are then separately tradeable like other securities. The term derives from the program implemented by the Treasury to facilitate this type of trading, entitled "Separate Trading of Interest and Principal of Securities."
 
 
 [2]
 The Lynch Report was issued in August of 1994, and concluded that Jett acted alone in his scheme. However, the report stated that Kidder's failure to discover the scheme early on was the result of inadequate supervision and poor judgment by Kidder management and auditors
 
 
 [3]
 A motion to dismiss plaintiffs' amended complaint was also filed in the Kidder action. The district court, however, denied the motion. Accordingly, the action against the Kidder defendants currently is proceeding in the district court
 
 
 [4]
 In this context, opportunity "entail[s] the means and likely prospect of achieving concrete benefits by the means alleged." Shields, 25 F.3d at 1130
 
 
 [5]
 If we accept this as sufficient motive, then we must accept as motive that every publicly-held corporation desires its stock to be priced highly by the market. At that point, the motive requirement becomes meaningless
 
 
 [6]
 Plaintiffs also argue that GE was motivated to ignore Jett's scheme in order to ensure that Kidder received bank financing and to increase GE's chances of selling Kidder. However, neither of these motives were presented to the district court, and have been advanced for the first time on appeal. Because we will "not consider an issue not passed upon below," Amalgamated Clothing and Textile Workers Union v. Wal-Mart Stores, Inc., 54 F.3d 69, 73 (2d Cir.1995) (quotation omitted), we decline to address the sufficiency of these allegations
 
 
 [7]
 The plaintiffs argue that the district court, in dismissing their amended complaint, improperly undertook the role of a jury when it evaluated competing inferences to find that GE's actions were not reckless but instead "mismanagement at most." We do not accept this argument. The district court found that the plaintiffs' allegations failed to meet the standards in Fed.R.Civ.P. 9(b) and 12(b)(6). In doing so, the court simply refused to credit plaintiffs' argument that an inference of recklessness rationally could be made
 
 
 [8]
 In fact, the plaintiffs argue that the district court conflated this method of proving scienter with the motive and opportunity method. This argument is without merit. The court clearly stated that, "Plaintiffs also fail to successfully allege that GE's reporting of those earnings was the type of highly unreasonable or reckless activity that may give rise to actionable securities fraud."
 
 
 [9]
 For instance, the plaintiffs contend that GAAP required GE to accurately report Kidder's revenue, operating profit or loss, assets, expenses, and other information. In addition, they argue that the SEC required GE to disclose accurate information in its annual 10-K filings concerning Kidder's capital resources, liquidity, and operations