CITY OF STERLING HEIGHTS PO-
LICE & FIRE RETIREMENT SYS-
TEM, On Behalf of Itself and All Oth-
ers Similarly Situated, Plaintiff,

v.

VODAFONE GROUP PUBLIC LIMIT-
ED COMPANY, Arun Sarin, Kenneth
J. Hydon, Alan P. Harper, and Lord
Ian MacLaurin, Defendants.

No. 07 Civ. 9921(PKC).

United States District Court,
S.D. New York.

May 20, 2009.

David Avi Rosenfeld, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY, for Plaintiff.

Gandolfo Vincent Diblasi, Elizabeth Kayla Ehrlich, Jordan Toumey Razza, Theodore Edelman, Sullivan and Cromwell, LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

The plaintiff alleges in an Amended Class Action Complaint (the "Complaint") that the defendants violated federal securities laws, principally by failing to take timely impairment charges for *the* declining good will of defendant Vodafone Group Public Limited Company ("Vodafone," or the "Company") and by failing to disclose that Vodafone would likely incur $8.7 billion *in* tax obligations. The *plaintiff asserts claims* on behalf of all persons who purchased publicly traded securities of Vodafone between June 10, 2004 and February 27, 2006. (Compl. ¶ 1.) It alleges that all defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The Complaint also asserts a claim of control-person liability under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), against defendants Arun Sarin, Kenneth J, Hydon, Alan P. Harper and Lord Ian MacLaurin (the "Individual Defendants").

Defendants move to dismiss the Complaint. In a Memorandum and Order dated November 24, 2008, I held that the Court lacked subject matter jurisdiction over the claims of plaintiff The City of Edinburgh Council on Behalf of Lothian Pension Fund. *See City of Edinburgh Council ex rel. Lothian Pension Fund v. Vodafone Group Public Co.,* 2008 WL 5062669 (S.D.N.Y. Nov. 24, 2008), *reconsideration denied in part and granted in part,* 2009 WL 980304 (S.D.N.Y. Apr. 9, 2009). The Court did not address the claims of plaintiff City of Sterling Heights Police & Fire Retirement System ("Sterling Heights") in its November 2008 decision. The caption is amended to reflect that Sterling Heights is the only remaining plaintiff. I now consider the defendants' motion to dismiss the claims of Sterling Heights pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(1)-(3)(A) (the "PSLRA").

## BACKGROUND

Vodafone is a telecommunications company with operations principally concentrated in Europe, the United States and the Asia Pacific. (Compl. ¶ 25.) During the Class Period, defendant Sarin was Vodafone's chief executive officer, MacLaurin was chairman of the board of directors, Harper held the title of group strategy and

business integration director, and Hydon was chief financial officer, as well as a board member. (Compl. ¶¶ 26, 29, 34–36.)

Vodafone was formed in 1983. (Compl. ¶ 44.) According to the Complaint, the Company grew rapidly through a series of acquisitions, including the 2000 acquisition of a German telecommunications company, Mannesmann, and the acquisition of a separate network in Italy, Omnitel. (Compl. ¶¶ 44–45.) Vodafone purchased Mannesmann for $170 billion, a price that the Complaint characterizes as "one of the largest acquisitions in business history." (Compl. ¶ 45.) The Complaint asserts that, in all, Vodafone has spent more than $300 billion on corporate acquisitions. (Compl. ¶ 45.) In the plaintiff's view, the Company's ambitious expansions led to large, unlawfully concealed losses stemming from deteriorating corporate good will in the acquired companies. In fiscal year 2002—shortly after its acquisition of Mannesmann—Vodafone announced a $7 billion write-down on its Mannesmann assets; the write-down was directed only to Mannesmann's ground-line assets, and not to its mobile assets. (Compl. ¶¶ 6, 46.) Vodafone's share price dipped as a result. (Compl. ¶¶ 46–47.) At the time it wrote down the value of the Mannesmann ground-line assets, the Company indicated that no future asset-impairment write-downs would be required for its Mannesmann assets. (Compl. ¶ 6.)

Vodafone pursued another large telecom acquisition in 2004, this time of AT & T's wireless assets. (Compl. ¶ 7.) Vodafone's share price dipped, and according to the Complaint, the negative shareholder reaction prompted Company management to abandon the deal. (Compl. ¶¶ 7, 49, 50.) According to plaintiff, the price decline pressured Vodafone's management team to boost the Company's share value, including

for reasons related to management's own enrichment. (Compl. ¶¶ 8, 50.)

Sterling Heights alleges that in order to maintain a high share value, Vodafone management began to assert that its operating units were performing profitably, and predicted "huge cash flow improvements" in coming years. (Compl. ¶ 9.) According to the Complaint, Vodafone then issued financial statements that falsely inflated the company's results and future business prospects, including the exaggeration of likely operating profits, EBITDA, assets and net worth. (Compl. ¶¶ 9–11.) The Complaint quotes a litany of statements by the Company concerning its robust financial health and strong prospects for success, including assertions made in public filings, analyst calls and statements to the media. (Compl. ¶¶ 51–105, 117–22.) Specifically, the plaintiff notes that Company management indicated to investors that Vodafone's operations in Germany and Italy were growing, and that its operations in Japan were improving. (Compl. ¶¶ 10–11.) The plaintiff also contends that defendants overstated the success of a so-called "One Vodafone" program (which was intended to integrate and streamline the company operations) and the success of new 3–G phones and services in Japan. (Compl. ¶¶ 10–11.) The plaintiff contends that these statements were fraudulent because they failed to alert the investing public to the deterioration of Company good will, which should have been recognized with a timely impairment charge. (Compl. ¶ 10.)

In late 2005, Vodafone and its management then made a series of disclosures that climaxed with a large impairment charge against the good will of Company assets. On November 15, 2005, Vodafone disclosed: (1) a 23–percent decline in operating profits; (2) $7 billion in cash-flow impairments stemming from tax obli-

gations to government authorities; and (3) a sharp drop in the EBITDA of its Japanese operations. (Compl. ¶ 14.) On February 27, 2006, Vodafone announced that it would incur a $40–49 billion impairment charge associated with its German, Italian and Japanese operations. (Compl. ¶¶ 14, 124, 131.) According to news reports, the impairment charge arose from the Company's reduced growth assumptions for its 2007 budget, but the Complaint also asserts that the Company overrepresented its worth in financial statements filed in fiscal years 2004 through 2006. (Compl. ¶ 128, 131.)

The announcement of the impairment charge was followed by a decline in share price. (Compl. ¶¶ 14, 131.) Plaintiff alleges that prior to the Company's disclosures of loss, the individual defendants sold approximately 11.1 million shares of personally held Vodafone stock for proceeds of more than $29 million. (Compl. ¶ 153.) According to the Complaint, defendant Sarin later "admitted" that previous growth forecasts had proved inaccurate. (Compl. ¶ 132.)

## STANDARD ON A MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009) (quoting *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal,* 556 U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The PSLRA has "imposed heightened pleading requirements and a loss causation require-ment upon 'any private action' arising from the Securities Exchange Act." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 773, 169 L.Ed.2d 627 (2008) (quoting 15 U.S.C. § 78u–4(b)).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed.R.Civ.P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA, Local 134,* 553 F.3d at 196 (citing *Tellabs,* 127 S.Ct. at 2508). This pleading threshold gives a defendant notice of the plaintiff's claim, safeguards a defendant's reputation and protects against strike suits. See *ATSI Communications, Inc. v. Shaar Fund,* 493 F.3d 87, 99 (2d Cir.2007). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 99 (citing *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000)).

Rule 9(b), Fed.R.Civ.P., requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b), Fed.R.Civ.P. The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'" *ATSI,* 493 F.3d at 104 (quoting *Segal v.*

*Gordon,* 467 F.2d 602, 606, 608 (2d Cir. 1972)). "The [PSLRA] insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. § 78u–4(b) (1), (2)). To plead fraud under the PSLRA, plaintiffs "must do more than say that the statements ... were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir. 2004).

 The PSLRA also "requires plaintiffs to state with particularity ... the facts evidencing scienter, i.e., the defendant's intention to 'deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2504, 168 L.Ed.2d 179 (2007) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). To qualify as "strong," the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504–05.

## DISCUSSION

 The defendants assert several grounds for the dismissal of the Complaint. They argue that the Complaint fails to allege any fraudulent statements and that it fails to identify when and why certain future developments should have been anticipated and disclosed. They further assert that the Complaint premises its claims on non-actionable statements of puffery, forward-looking statements and third-party statements, and that it fails to allege scienter. They separately move to dismiss the claim for control-person liability under section 20(a).

> I. *The Plaintiff's Claim Under Section 10(b) and Rule 10b–5 is Dismissed for Failure to Plead Fraud With Particularity.*

Section 10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe ...." 15 U.S.C. § 78j(b). "The SEC rule implementing the statute, Rule 10b–5, prohibits 'mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.'" *ECA, Local 134,* 553 F.3d at 197 (alterations in original) (quoting Rule 10b–5).

 As Judge Cote has observed, "[s]ection 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." *In re Openwave Systems Securities Litigation,* 528 F.Supp.2d 236, 249 (S.D.N.Y.2007) (citing *Ernst & Ernst,* 425 U.S. at 206, 96 S.Ct. 1375). A typical action brought under section 10(b) requires a plaintiff to prove (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge,* 128 S.Ct. at 768 (citing *Dura,* 544 U.S. at 341–42, 125 S.Ct. 1627).

■ The securities laws do not provide a cause of action premised upon a hindsight review of faulty predictions as to business success. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.... Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak,* 216 F.3d at 309 (citing *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)); *see also Acito v. IMCERA Group. Inc.,* 47 F.3d 47, 53 (2d Cir.1995) ("lack of clairvoyance simply does not constitute securities fraud"). "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak,* 216 F.3d at 309.

A. *With Respect to the Good Will Impairment Charge, the Complaint Fails to Allege Fraud With Particularity.*

The plaintiff asserts that Vodafone fraudulently failed to disclose that the good will value of its German, Japanese and Italian operations had declined to the point where an impairment charge would be necessary. It asserts that by fiscal year 2004, the good will value of Mannesmann and of Vodafone's operations in Italy and Japan "had deteriorated dramatically as compared to the value at the acquisition dates, including when Vodafone paid hundreds of billions of dollars for Mannesmann in early 2000." (Compl. ¶ 139.) As a result, the Complaint asserts, the defendants should have incurred an impairment charge for the decreased value of Vodafone's good will prior to February 2006. (Compl. ¶ 144.)

According to the Complaint, Vodafone "shocked the markets" on February 27, 2006, when it announced "a massive goodwill write-down in the goodwill for Vodafone Germany ... Vodafone Italy and, particularly, Vodafone Japan ... reflecting a lower view of growth prospects, particularly in the medium to long term, than those it had used previously ...." (Compl. ¶ 124.) The write-down amounted to a 25 percent decline of Vodafone's "equity base." (Compl. ¶ 124.) The Complaint quotes a number of third-party sources expressing surprise at the write-down: "The Evening Standard," "The Financial Times," and "The Times (London)," as well as analysts at Citigroup, Morgan Stanley, and Oppenheimer, variously characterized the announcement as a "shock," a loss of "further credibility" for Company management, "the clearest financial acknowledgement yet of just how hubristic the [Mannesmann] deal was," and the product of "a litany of business failures and wasted opportunities." (Compl. ¶¶ 125–130.)

Accounting industry guidelines address a company's assessments of good will. The International Financial Reporting Standards ("IFRS") require that good will be tested for impairment at least annually and when indicators show possible impairment. (Compl. ¶ 137.) To calculate good will value under the IFRS, an asset's carrying value is to be compared to its recoverable amount, with any shortfall between the two recorded as a loss. (Compl. ¶ 137.) The Generally Accepted Accounting Principles ("GAAP"), as codified at FASB Statement of Financial Accounting Standards ("SFAS") Number 142, similarly requires that companies recognize an impairment loss for good will when the carrying amount exceeds its fair value. (Compl. ¶ 138.)

■ Failure to take an impairment charge under these standards may consti-

tute securities fraud when "the need to write-down [the asset] ... was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud.'" *Caiafa v. Sea Containers Ltd.*, 525 F.Supp.2d 398, 410 (S.D.N.Y.2007) (alterations and ellipsis in original) (quoting *In re K-tel International, Inc. Securities Litigation*, 107 F.Supp.2d 994, 1001 (D.Minn.2000), *aff'd*, 300 F.3d 881 (8th Cir.2002)). *Caiafa* dismissed a securities fraud claim because the complaint did not cite the amount by which certain assets should have been written down, and failed to allege when the write-downs should have occurred. *Id.* at 410–11 & 411 n. 10. *See also Fadem v. Ford Motor Co.*, 352 F.Supp.2d 501, 512 (S.D.N.Y.2005) (dismissing securities fraud claim when company disclosed the likelihood of future losses, but did not formally recognized them until losses actually occurred); *Rosen v. Textron, Inc.*, 321 F.Supp.2d 308, 326–27 (D.R.I.2004) ("Here, the Plaintiffs have relied exclusively on the timing of the write down, which is insufficient to state a claim for securities fraud under the PSLRA, since accounting standards require an allegation that future cashflow predictions were less than carrying amount in order to state a securities fraud claim.").

■ In addition, management's failure to accurately forecast evolving business conditions does not equate to fraudulent conduct. *In re Loral Space & Communications Ltd. Securities Litigation*, 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004), concluded that the company's failure to take impairment charges was not a viable basis for a securities fraud claim. Dismissing claims under the PSLRA, Judge Koeltl held that "the evolving poor performance of [the company] during 2000 was publicly disclosed. When the impairments became so severe as to require spe-

cific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment." *Id.*

■ On the other hand, if pleaded with particularity and based on allegations that a defendant disregarded clear and unmistakable loss, the failure to take impairment charges may provide a viable basis for a securities fraud claim. See *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F.Supp.2d 429, 465–66 (S.D.N.Y. 2005) (securities fraud claim upheld when timely impairment charges were not made despite management's recognition that the telecommunications market had "imploded" and that confidential sources indicated that the company missed sales targets by 80–90 percent and asset values were vastly overstated); *In re Omnicom Group Securities Litigation*, 2005 WL 735937, at **8–9 (S.D.N.Y. Mar. 30, 2005) (securities fraud claim upheld when assets experienced a 95 percent market drop in one year and company suffered significant losses, yet failed to take write-down charge); *In re Global Crossing, Ltd. Securities Litigation*, 322 F.Supp.2d 319, 343 (S.D.N.Y. Mar. 23, 2004) (securities fraud claim upheld when complaint included detailed allegations about the causes of price declines that would undermine the company's product demands and force it "to sell 90% of its available capacity just to cover its cable construction costs"); *In re Vivendi Universal, S.A.*, 381 F.Supp.2d 158, 176–77 (S.D.N.Y.2003) (securities fraud claim upheld when internal memoranda indicated that good will impairment charges were needed, and impairment charges were incurred only after new management assumed control).

The Complaint in this action fails to plead a viable claim of securities fraud. It is undermined by a failure to allege at what point in time an impairment charge

should have been taken and which specific losses known to the Company should have triggered an impairment charge. It contains a litany of non-actionable allegations that can fairly be characterized as broad and conclusory.

First, the Complaint omits key factual allegations that relate to the good will accounting standards that it cites as definitive. The Complaint notes the roles of the IFRS and GAAP in determining the obligation to incur impairment charges, but only alleges, in conclusory fashion, that "[p]ursuant to IFRS and U.S. GAAP, the Company was required to recognize a loss to reflect the impairment in good will." (Compl. ¶ 144.) Elsewhere, the Complaint asserts in a footnote that prior to adopting the IFRS for fiscal year 2006, Vodafone had encouraged investors to focus on its operating profits or EBITDA, "which did not include non-cash good will amortization charges." (Compl. at 7 n. 4.) It notes that Vodafone makes public filings to the SEC and presents its results in compliance with GAAP. (Compl. ¶ 22.) According to the Complaint, Vodafone claimed in its "2004 financial statements" that the Company undertook a review "to assess whether the carrying value of assets was supported by the net present value of future cash flows derived from assets using cash flow projections for each asset in respect of the period to 31 March 2014," and concluded that "no impairment charge was necessary." (Compl. ¶ 56.)

These allegations do not plead with particularity that Vodafone fraudulently violated accounting standards. In

*In re Wet Seal Inc. Securities Litigation,* 518 F.Supp.2d 1148, 1160–62 (C.D.Cal. 2007), the plaintiff argued that GAAP required an impairment charge to be taken a year earlier than incurred. The court noted that in this instance, the impairment charge was contingent on the company's judgment about future events and its likely future income. *Id.* at 1160 n. 2. In addition, the complaint failed to "connect up" the company's alleged losses with the relevant GAAP standard. *Id.* at 1161. As a result, it failed to plead with particularity a securities fraud claim as to the timing of the disputed impairment charge. *Id.* at 1162. The Second Circuit in *ATSI,* 493 F.3d at 106, similarly held that a complaint failed to state a claim of securities fraud when it failed to connect underlying factual allegations with its theory of fraud. In *ATSI,* the plaintiff pleaded "a generalized allegation" that defendants engaged in a scheme of "death spiral" financing, but failed to allege how the defendants' conduct rose to the level of fraud in regard to the underlying loss. *Id.* The plaintiff in this case has similarly failed to assert in the Complaint how the accounting standards should be applied to determine the points in time when additional impairment charges should have been incurred and why the impairment charges were required.[1]

In addition to its vague allegations relating to compliance with GAAP and IFRS standards for valuing good will, the Complaint's allegations of fraudulent conduct are conclusory and general. The plaintiff alleges that because the Company's opera-

---

1. Of course, "[i]t has been the long-held view in this Circuit that GAAP neither establishes nor shields guilt in a securities fraud case." *United States v. Rigas,* 490 F.3d 208, 220 (2d Cir.2007) (citing *United States v. Simon,* 425 F.2d 796, 805–06 (2d Cir.1969) (Friendly, J.)), *cert. denied,* —— U.S. ——, 128 S.Ct. 1471, 170 L.Ed.2d 296 (2008); *see also Stevelman v.*

*Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (" '[A]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.' ") (quoting *Chill v. General Electric Co.,* 101 F.3d 263, 270 (2d Cir.1996)); *accord ECA, Local 134,* 553 F.3d at 200.

tions in Germany, Japan and Italy had not expanded as rapidly as expected at the time of acquisition, the defendants were "increasingly aware that the impairment indicators existed." (Compl. ¶ 139.) The Complaint speculates that Mannesmann's "extremely high price" left Vodafone with "no margin of error." (Compl. ¶ 140.) "Thus, once the German results were even the slightest bit disappointing, impairment would exist." (Compl. ¶ 141.) Such assertions are too broad to be objectively assessed and fail to identify any awareness by the defendants that an impairment charge was necessary.

Elsewhere, the Complaint seeks to elevate the plaintiffs assessment of business trends to evidence of a fraudulent scheme. According to the Complaint, from 2002 to 2004, "German semi-annual sales grew only from £2.0 billion to £2.6 billion," with EBITDA "stubbornly below £1 billion. This was not much of a return for the £100+ billion merger." (Compl. ¶ 141.) The Complaint alleges that in light of Mannesmann's own struggles and the broader woes of the German telecom market, defendants should have taken an impairment charge on the Company's good will. (Compl. ¶ 141, 144.) The Complaint asserts that Vodafone's purchase price for Mannesmann "looked increasingly inflated by 2004, at the latest," and that to the extent Vodafone recorded impairment for its German operations, it had been for "a part of the business Vodafone was not that interested in anyway." (Compl. ¶ 139, 142.)

The Complaint contains similarly vague allegations concerning operations in Japan and Italy. It characterizes Italian and Japanese results as "disappointing," stating that Vodafone's numbers in Japan "declined for the first time in 8/04" without any subsequent write-off. (Compl. ¶ 143.) Immediately after Vodafone sold its Japa-nese interests, the acquiring company wrote down half of the business's assets—a loss of approximately $4.5 billion. (Compl. ¶ 143.) According to the Complaint, the write-down was evidence of a "massive overstatement" of Vodafone assets and good will as they pertained to German, Italian and Japanese operations, while in actuality they were "faltering and losing ground to competitors." (Compl. ¶¶ 68(a), 68(j), 75(a), 75(1), 78(a), 78(1), 84(a), 84(1), 94(a), 94(1), 104(a), 104(1), 123(a), 123(k).)

These conclusions about the Company's need to incur an impairment charge to its good will value follow numerous, lengthy excerpts from the Company's S.E.C. filings, analyst calls and third-party summaries, large portions of which are bolded and italicized for emphasis. (Compl. ¶¶ 51–132.) The quotations often reflect a confidence toward the Company's future prospects, and are contrasted in the Complaint with the later disappointing results and the impairment charge taken to the Company's good will value. As noted, "defendants' lack of clairvoyance simply does not constitute securities fraud," *Acito*, 47 F.3d at 53, and "[a]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud," *Novak*, 216 F.3d at 309. The Complaint identifies certain business risks in the Company's ambitious expansion strategies, but it does not sufficiently allege when and why corrective actions were required of the Company. *See, e.g., Edison Fund v. Cogent Investment Strategies Fund, Ltd.*, 551 F.Supp.2d 210, 225–26 (S.D.N.Y.2008) (complaint pleaded with particularity the need to alert investors immediately about risks in subprime automobile loans in light of a highly unusual industry-wide alert letter).

The Complaint's descriptions, conclusions and characterizations do not plead

fraud with the particularity required to satisfy Rule 9(b) or the PSLRA. See *ATSI*, 493 F.3d at 103, 106 (Rule 9(b) and PSLRA not satisfied when a complaint "relies, at best, on speculative inferences" and offers "generalized allegations" as to wrongdoing). That Vodafone ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent. *See Caiafa*, 525 F.Supp.2d at 410–11 (granting motion to dismiss because complaint failed to plead how a failure to earlier incur a $500 million impairment charge was fraudulent); *Alaska Electrical Pension Fund v. Adecco S.A.*, 434 F.Supp.2d 815, 823 (S.D.Cal.2006) (plaintiffs required to plead with particularity why the failure to take an earlier write-down constituted fraud), *aff'd*, 256 Fed.Appx. 74 (9th Cir.2007). Moreover, as the Complaint observes, Vodafone undertook annual reviews of its good will value, and periodically recorded impairment charges as a result. (Compl. ¶¶ 55, 56, 91, 92, 118.)

The Complaint fails to plead with particularity that defendants fraudulently delayed impairment charges of the Company's good will. The claim therefore is dismissed.

B. *The Complaint Fails to Allege with Particularity that the Defendants' Statements Regarding Tax Charges Constituted Fraud.*

▮ On November 15, 2005, Vodafone announced that it would pay $8.7 billion in taxes "over the next few years," which "stunned the securities markets" and caused Vodafone share value "to plunge lower." (Compl. ¶ 105.) Reaction among the financial press and financial analysts was unfavorable. (Compl. ¶¶ 106–16, 119, 125.) The plaintiff asserts that Vodafone's announcement of tax liabilities contrasted with previous assertions by the Company, such as a June 2004 statement that Vodafone would owe only a "modest increase in tax payments" in the future (Compl. ¶ 9(iv)) and a January 20, 2005 oral statement that "[i]t is very difficult to predict the exact timing of uh tax unwinds given the, it depends on tax authorities and also depends on future capital expenditure plans." (Compl. ¶ 77.) The plaintiff also cites to the remarks of third parties, including a Bear Stearns analyst who stated, "Our historic conversations on deferred tax liabilities with the Company suggested that any imminent unwinding was not likely to occur." (Compl. ¶ 115.) According to a Financial Times article, defendant Sarin addressed reactions to the Company's tax liabilities by stating, "Maybe the messaging wasn't good and for that I take responsibility." (Compl. ¶ 119.)

The Complaint omits essential details concerning Vodafone's tax obligations. It does not allege that the defendants had knowledge that the $8.7 billion tax charge was imminent. It does not identify which nations or governmental entities were owed tax payments, and it fails to cite any statements preceding the November 15 announcement that could be construed as misleading or contradictory to the announcement. Indeed, certain of defendants' statements that are cited in the Complaint indicate that Vodafone publicly acknowledged uncertainties as to its future tax obligations and the possibility that near-term tax obligations would arise. It quotes excerpts from a conference call with analysts on January 20, 2005, in which a Vodafone representative stated, in relevant part:

> We have got a large deferred tax balance .... [O]ff the top of my head, you know, can't give you a split on, you know, how much of that we can say will be indefinitely carried forward, how much will be split or give you an accu-

rate timing on that. It is very difficult to predict the exact timing of uh tax unwinds given the, it depends on tax authorities and also depends on future capital expenditure plans.

(Compl. ¶ 77.) Far from constituting a fraudulent statement by Vodafone, as the plaintiff alleges, these remarks acknowledge uncertainties about the Company's tax obligations. The Company separately stated that its obligations on deferred tax payments were not "imminent," would occur "in due course," but that the Company could not state an "accurate timing on that" because it was "very difficult to predict."[2] (Compl. ¶ 11(h).) Many of the statements cited in the Complaint reflect surprise by third parties concerning the announcement of Vodafone's tax obligations, but none can be construed as a fraudulent statement by the Company or a material or omission concerning tax liabilities as they later became apparent in November 2005.

■ False and misleading statements concerning a company's tax obligations may provide a basis for a securities fraud claim. *See, e.g., Rubinberg v. Hydronic Fabrications, Inc.,* 775 F.Supp. 56, 62 (E.D.N.Y.1991) (upholding claim when complaint alleged that company untruthfully asserted that "sales tax liabilities would not exceed $43,000, when in fact they greatly exceeded that sum," and did not disclose that the company "was in fact under an investigation conducted by the New York State Sales Tax division."). As with the defendants in *In re IAC/InterActiveCorp Securities Litigation,* 478 F.Supp.2d 574, 592–93 (S.D.N.Y.2007), Vodafone acknowledged that tax payments were likely to become due, but expressed uncertainty as to the circumstances that would necessitate their payment. Here, as with *IAC,* the allegations are insufficient to plead fraud with particularity. Cf *Plymouth County Retirement Ass'n v. Schroeder,* 576 F.Supp.2d 360, 384 (E.D.N.Y. 2008) (dismissing securities fraud claim based on alleged possibility of future tax charges, the basis for which was deemed "sparse and speculative, at best."). The securities fraud claim premised upon undisclosed tax liabilities is dismissed.

## II. The Plaintiff's Claim of Section 20(a) Liability is Dismissed.

■ Count II of the Complaint alleges that the Individual Defendants are separately liable as control persons under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). "In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quotation marks omitted). Because the Complaint fails to plead a primary violation, the Section 20(a) claim is dismissed.

## III. The Plaintiff is Granted Leave to File a Motion to Amend the Complaint.

The plaintiff urges that in the event that this Court grants the defendants' motions, it should be granted leave to amend the Complaint to cure any pleading defects. (Opp. Mem. at 30 n. 28.) The plaintiff may move to amend (annexing the proposed pleading) and the pre-motion conference requirement is waived for any such motion filed prior to June 12, 2009. *See, e.g., ATSI,* 493 F.3d at 108 ("District courts

---

**2.** Although the statements in quotations are cited as direct quotations from the Company, Paragraph 11(h) does not identify the speaker or the context of the remarks.

typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under 9(b).")

CONCLUSION

The motion to dismiss is GRANTED and the Amended Class Action Complaint is dismissed.

Because I conclude that the Complaint fails to plead securities fraud with particularity, I do not address the other bases for the defendants' motion to dismiss.

SO ORDERED.